**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Yulius Mustafa,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Yuma Regional Medical Center, et al.,<br><br>　　　　　Defendants. | No. CV-21-00161-PHX-ROS<br><br>**ORDER** |

　　　Plaintiff Yulius Mustafa ("Plaintiff" or "Dr. Mustafa") has sued Defendants Yuma Regional Medical Center ("YRMC") and two of YRMC's employees, Dr. Bharat Magu and Dr. Robert Trenschel ("individual defendants"). Plaintiff argues he qualified as an employee of YRMC under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311, and that Defendants thus violated USERRA and the Arizona Employment Protection Act, Ariz. Rev. Stat. § 23-1501(A)(3)(c)(iii), by terminating Plaintiff's employment while he was deployed with the United States Army. Defendants argue Plaintiff was an independent contractor, rendering those two statutes irrelevant. Pending before the Court are cross-motions for summary judgment on the issue of Plaintiff's employment classification, and Defendant's motion for summary judgment on all five of Plaintiff's claims. For the reasons below, Plaintiff's motion for summary judgment is denied, and Defendants' is granted.

//

//

**BACKGROUND**[1]

YRMC operates a hospital in Yuma, Arizona. (Complaint, Doc. 1 ¶ 11; Answer, Doc. 6 ¶ 11). At time relevant to this suit, Dr. Magu was the Chief Medical Officer and Dr. Trenschel was the Chief Executive Officer of YRMC. (Doc. 1 ¶¶ 3-4; Doc. 6 ¶¶ 3-4). Plaintiff, a hospitalist who performed work for YRMC through a variety of agreements, serves as a member of the Army Reserves. (Doc. 1 ¶ 14; Doc. 6 ¶ 14).

From 2005 to 2016, Plaintiff worked as a hospitalist for YRMC through agreements with various staffing agencies. (Doc. 30 at 72 (Aff. of Dr. Mustafa)). As relevant here, Plaintiff's final agreement with a separate staffing agency company ended in 2016. When that agreement ended, Plaintiff had a choice either to be identified as an employee of YRMC or as an independent contractor. (Doc. 30 at 42-43 (Mustafa Deposition at 58-59) ("Mustafa Depo."); Doc. 31-6 at 14-16 (YRMC 30(b)(6) Deposition at 55-57) ("YRMC Depo.")). Plaintiff discussed his options with an accountant, who advised him that a 1099 Independent Contractor arrangement was more beneficial for tax purposes than a traditional W2 employee arrangement. (Mustafa Depo. at 84-85). Plaintiff ultimately opted to be labeled an independent contractor, and he formed a single member Professional Limited Liability Company named 1ID Vanguard, PLLC for the purpose of entering into an agreement with YRMC. (*See* Mustafa Depo. at 70).

Plaintiff and YRMC entered into an Independent Contractor Agreement ("ICA") on October 1, 2016. (Doc. 30 at 161; Doc. 31-8). The ICA specified the arrangement between Plaintiff and YRMC was "non-exclusive in nature." (ICA at § 1.1). The ICA also specified that Plaintiff had the "right to establish the days and hours during which [he would] provide . . . services" but that his schedule was "subject to approval by [Defendants]." (ICA at § 1.2). Plaintiff would not be "guarantee[d]" a minimum number of hours, shifts, or patients at YRMC. *Id.* Plaintiff would be paid on an hourly basis. (ICA at § 2.1). Plaintiff's patients' medical records, along with "all fees and funds owing or collected for Services provided by [Plaintiff]" and "any other monies or accounts receivable for Services" would be "the

---
[1] The parties did not submit statements of facts, but the following facts are undisputed, with some facts reserved for discussion later in the order.

property of YRMC." (ICA at § 1.5). Additionally, YRMC would "direct and control the assignment of patients to [Plaintiff]. Such determination shall be made solely by YRMC in the best interest of the patient and YRMC." (ICA at § 1.7). YRMC agreed to provide Plaintiff with professional liability insurance beginning on his first day of work and ending when the ICA terminated. (ICA at § 3.1).

Critically, the ICA stated its term "commence[d] on October 1, 2016" and would "continue through a term mutually agreed upon, but not longer than three (3) years, unless YRMC and [Plaintiff] agree[d] mutually to amend the terms." (ICA at § 4.1). The ICA specified Plaintiff was an "independent contractor." (ICA at § 8.1). Lastly, the ICA stated, "Nothing in this Agreement shall be interpreted to dictate Physician's practice of medicine, delivery of direct patient care or independent judgment," and that Plaintiff "shall have complete control over the diagnosis and treatment of patients." (ICA at § 11). However, Plaintiff's work with patients had to "be consistent with any written rules and regulations promulgated by YRMC and, if applicable, the facility(s) dealing with the general treatment of patients." *Id*.

In July 2019, Plaintiff was deployed by the Army to the Middle East for approximately 8 months. (Doc. 1 ¶ 15). On October 1, 2019, by its own terms, the Independent Contractor Agreement between YRMC and Plaintiff expired. (ICA at § 4.1). On February 27, 2020, Plaintiff learned his deployment would end soon. (Doc 35-1 at 33). On February 29, Plaintiff emailed YRMC staff to notify them he would be returning to work as soon as March. (Doc. 35-1 at 35). YRMC staff met with Plaintiff in early March 2020 and informed him the ICA had expired a few months earlier, and they would not be renewing the contract. (Doc. 35-1 at 40). Neither individual defendant was present at that meeting. *Id.*

Plaintiff filed suit in January of 2021, asserting five claims: (i) violation of USERRA for failing to reemploy Plaintiff after his military deployment; (ii) violation of Ariz. Rev. Stat. § 23-1501(A)(3)(c)(vii) for terminating Plaintiff's employment in retaliation for his military service; (iii) breach of the implied covenant of good faith and fair dealing; (iv) aiding and abetting; and (v) tortious interference with a business

expectancy or contractual relationship. Plaintiff seeks, among other things, an order declaring Defendants' actions were unlawful and requiring Defendants to place him "in the position he would have occupied but for Defendants' unlawful actions," and compensatory, punitive, statutory, and liquidated damages.

## LEGAL STANDARD

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial. *Id.* When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). When parties file cross-motions for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Echanove v. Allstate Ins. Co.*, 752 F. Supp. 2d 1105, 1107-08 (D. Ariz. 2010) (quoting *Fair Housing council of Riverside Cty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001)).

## ANALYSIS

### I. USERRA

USERRA was enacted in 1994 "to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and

employment which can result from such service." *Belaustegui v. Int'l Longshore and Warehouse Union*, 36 F.4th 919, 923 (9th Cir. 2022) (quoting 38 U.S.C. § 4301(a)(1)). The statute thus requires "the prompt reemployment" of eligible servicemembers upon the completion of their military service, and it further prohibits "discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a)(2)-(3). Indeed, "[a]n employer violates USERRA if an employee's membership or obligation for service in the military is a motivating factor in an employer's adverse employment action taken against the employee, unless the employer can prove that the action would have been taken in the absence of such membership or obligation." *Townsend v. Univ. of Alaska*, 543 F.3d 478, 482 (9th Cir. 2008).

### A. Employment Classification under USERRA

"USERRA does not provide protections for an independent contractor." 20 C.F.R. § 1002.44(a). Thus, a threshold question is whether Plaintiff was an employee protected by USERRA or an independent contractor who was not. The USERRA regulations establish "[i]n deciding whether an individual is an [employee or an] independent contractor, the following factors need to be considered:

(1) The extent of the employer's right to control the manner in which the individual's work is to be performed;

(2) The opportunity for profit or loss that depends upon the individual's managerial skill;

(3) Any investment in equipment or materials required for the individual's tasks, or his or her employment of helpers;

(4) Whether the service the individual performs requires a special skill;

(5) The degree of permanence of the individual's working relationship; and

(6) Whether the service the individual performs is an integral part of the employer's business."

20 C.F.R. § 1002.44(b). *See also Murphy v. Tuality Healthcare*, 157 F. Supp. 3d 921, 926 (D. Or. 2016). No single factor is determinative; rather, "all are relevant." 20 C.F.R. § 1002.44(c).

The case law interpreting employment classification for the purpose of USERRA liability is "sparse," but courts look to case law interpreting analogous provisions of the Fair Labor Standards Act (FLSA) for guidance. *Evans v. MassMutual Finance Group*, 856 F. Supp. 2d 606, 609 (W.D.N.Y. 2012). *See also Murphy*, 157 F. Supp. 3d at 925 (quoting H.R. Rep. No. 103-65(l), at 2454 (1993)) ("Congress intended that USERRA 'would define "employee" in the same expansive manner as under the Fair Labor Standards Act . . . and the issue of independent contractor versus employee should be treated in the same manner as under the Fair Labor Standards Act'"). Accordingly, just as in the FLSA context, "[n]either the common law concepts of 'employee' and 'independent contractor' nor contractual provisions purporting to describe the relationship are determinative of employment status." *Perez v. Ariz. Logistics Inc.*, No. CV-16-04499-PHX-DLR, 2022 WL 973585, at *1 (D. Ariz. Mar. 31, 2022) (quoting *Nash v. Resources, Inc.*, 982 F. Supp. 1427, 1433 (D. Or. 1997)). Rather, the six-factor test articulated in case law under the FLSA and codified in USERRA regulations governs the inquiry. *Id*. at *1-2 (citing *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979)) (listing six factor test); 20 C.F.R. § 1002.44(b) (USERRA regulation listing same six factors).

For purposes of the FLSA, contract language identifying an individual as an independent contractor "is not conclusive. . . . Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA." *Real*, 603 F.3d at 755 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). The regulations promulgated under USERRA—likewise a remedial statute—codified the same test as developed in the FLSA context; accordingly, the economic realities of the parties' arrangement, as analyzed under the six factors listed above, determines Plaintiff's employment status.

Plaintiff argues he was an employee of YRMC when he was deployed and is thus entitled to protection under USERRA. (Doc. 30 at 11). Defendants argue Plaintiff was at all relevant times an independent contractor, so when his contract expired during his deployment and neither party sought to renew or reinstate it, Plaintiff was not protected by USERRA. (Doc. 31 at 1-2). While the parties briefed this issue extensively, the Court need

not definitively resolve Plaintiff's status as an employee or independent contractor because of the ruling that will follow. Even if the Court were inclined to find Plaintiff was an employee under USERRA, the merits of Plaintiff's USERRA claim would still need to be addressed. But Plaintiff has failed to make out a prima facie case of discrimination under USERRA that his service in the military was "a substantial or motivating factor in the adverse employment action." *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001). Even if Plaintiff had met this initial burden, Defendants have demonstrated the adverse action—not negotiating a new contract—would have been taken regardless of the Plaintiff's military status. *Id.*

Therefore, Plaintiff cannot survive summary judgment on the merits of his USERRA claim regardless of his employment classification.

### B. USERRA Liability

USERRA creates liability both for failing to rehire someone after a period of military service, 38 U.S.C. § 4312, and for discriminating against an employee because of their military service, 38 U.S.C. § 4311. These two provisions "protect different phases of employment." *Petty v. Metropolitan Gov. of Nashville & Davidson Cnty*, 687 F.3d 710, 716 (6th Cir. 2012). While the briefs primarily focus on the discrimination claim, Plaintiff's complaint lists both provisions. (Doc. 1 at ¶ 28).

#### i. Failure to Rehire Plaintiff

Assuming Plaintiff was an employee, he would have been entitled to reemployment. *See Petty*, 687 F.3d at 716-17 (citing 38 U.S.C. § 4312) (listing factors entitling an employee to reemployment). However, the statute is clear that a person entitled to reemployment under USERRA shall be reemployed "in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service." 38 U.S.C. § 4313(a)(2)(A). Thus, the statute does not "freeze" the employee's job as it stood when the employee deployed. Rather, this "escalator provision" contemplates time moving forward in the civilian workplace while the employee undertakes military service and aims to slot the employee back into employment as if he had never left. *See Vahey v. General Motors Co.*,

985 F. Supp. 2d 51, 60-61 (D.D.C. 2013). Importantly, the regulations make clear "the escalator principle may cause an employee to be reemployed in a higher or lower position, laid off, or even terminated." 20 C.F.R. § 1002.194. *See Vahey*, 985 F. Supp. 2d at 60-61. The Court must determine whether, considering the undisputed facts and drawing all reasonable inferences in favor of Plaintiff, there is a genuine issue of material fact regarding whether YRMC would have declined to renew Plaintiff's contract even if Plaintiff had not deployed.

Defendants first discussed the decision to "phase" Plaintiff "out of the schedule" in February 2019, months before his deployment began in July 2019 and his contract expired in October 2019, because of "many issues" including "not responding when asked by staff and poor patient care." (Doc. 31-14). While Plaintiff argues that was shortly after YRMC was notified of his deployment, there is nothing in the facts beyond Plaintiff's claim to suggest YRMC's decision not to renew the contract had anything to do with his military service. Citing issues with staff and patient complaints, YRMC expressed that Plaintiff "is not a good fit to [their] team." (Doc. 35-1 at 40). Therefore, there is no genuine issue of material fact as to whether Defendants would have renewed Plaintiff's contract had he not deployed.

### ii. Discrimination

To prove a violation of USERRA for discrimination, Plaintiff must make a prima facie case, by a preponderance of the admissible evidence, that his protected status was "a substantial or motivating factor in the adverse employment action." *Sheehan*, 240 F.3d at 1013; *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007) (quoting *Leisek*, 278 F.3d at 898-99). *See* 38 U.S.C. § 4311(c)(1). If Plaintiff meets his initial burden, Defendants may escape liability by demonstrating, by a preponderance of the admissible evidence, the adverse action would have been taken regardless of the Plaintiff's military status. *Sheehan*, 240 F.3d at 1014. Since Defendants moved for summary judgment on this issue, the Court draws all reasonable inferences in favor of Plaintiff. *See Anderson*, 477 U.S. at 248.

//

### a. Adverse Action

Defendants first argue Plaintiff's USERRA claim fails because there was no "adverse action." (Doc. 31 at 13). Defendants argue Plaintiff was not terminated; rather, the ICA expired on its own terms. *Id.* However, Plaintiff had an employment arrangement when he left for deployment, and Defendants did not reemploy him or negotiate a new contract upon his return. Construing USERRA liberally in favor of Plaintiff, the Court will assume this constituted an adverse employment action. *See Belaustegui*, 36 F.4th at 923; *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 551 (8th Cir. 2005) (quoting *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 312-13 (4th Cir. 2001)) ("[b]ecause USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries").

### b. Motivating Factor

"Under USERRA, military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Espinoza v. City of Seattle*, 458 F. Supp. 3d 1254, 1272 (W.D. Wash. 2020) (quoting *Campbell v. Catholic Cmty. Servs. of W. Wash.*, No. C10-1579-JCC, 2012 WL 13020051, at *2 (W.D. Wash. Aug. 1, 2012)). "To establish a certain factor as a motivating factor, a claimant need not show that it was the sole cause of the employment action, but rather that it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Bunting v. Town of Ocean City*, 409 F. App'x. 693, 695-96 (4th Cir. 2011). *See also Daubenspeck v. Textron Aviation Inc.*, No. CV-20-00465-PHX-ROS, 2021 WL 4803560, at *4 (D. Ariz. Oct. 13, 2021) (quoting *Leisek*, 278 F.3d at 898) ("USERRA replaced the 'sole motivation' test with a more lenient standard that requires only that the employee's military status was a 'motivating factor' in the employer's action"). A plaintiff can establish his military service was a "motivating factor" in an adverse employment action "through direct or circumstantial evidence." *Munoz v. InGenesis STGI Partners, LLC*, 182 F. Supp. 3d 1097, 1104 (S.D. Cal. 2016). To determine whether military service was a "motivating factor," the Ninth Circuit has instructed courts may consider a "variety of factors" including:

> proximity in time between the employee's military activity and the adverse

employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Leisek*, 278 F.3d at 900.

Defendants argue Plaintiff cannot meet the burden of showing his military service was a "motivating factor" in the decision not to renegotiate a contract. Plaintiff argues there are genuine issues of material fact as to Defendants' motivation. For the reasons below, the Court agrees with Defendants.

Defendants argue they made the decision to "phase" Plaintiff "out of the schedule" in February 2019, months before his deployment began in July 2019. (Doc. 31-14). Plaintiff asserts the Army notified YRMC of Plaintiff's deployment on January 9, 2019, and Plaintiff received his own orders on February 4, 2019. (Doc. 35-1 at 11, 13). Thus, he argues that YRMC's interest in "phasing" Plaintiff "out of the schedule" beginning in February 2019 was in immediate succession to the notification of his deployment, a closeness which might indicate a discriminatory motive. In March 2020, shortly after Plaintiff emailed to say he was interested in returning to work at YRMC after his deployment, YRMC staff emailed internally to discuss the matter; they acknowledged Plaintiff was a "1099 independent contractor" so "does not fall under a protection act," meaning they thought they were "not obligated to renew his contract." (Doc. 35-1 at 38). Another email sent after YRMC staff met with Plaintiff to inform him they would not be renewing his contract noted "it's ok not to renew his contract as he is 1099 and we thought he is not a good fit to our team." (Doc. 35-1 at 40).

Discriminatory motive can sometimes be inferred from "proximity in time between the employee's military activity and the adverse employment action." *Leisek*, 278 F.3d at 900. However, even looking at Plaintiff's alleged timeline, YRMC's internal communications occurred around the periods of time where Plaintiff's contract expiration came up. The email on February 25, 2019 in which Dr. Magu indicated Plaintiff "is being slowly phased out of the schedule" was in response to an email asking Dr. Magu if he was

"aware of the many issues with Dr. Mustafa" including "not responding when asked by staff and poor patient care." (Doc. 31-14). There is no admissible evidence that Dr. Magu knew of Plaintiff's impending deployment when he sent that email. Indeed, nothing in that document, nor in the record, indicates the decision to "phase out" Plaintiff was in response to notification of his deployment, which according to Plaintiff's timeline happened at least a month before. (*See* Doc. 35-1 at 11). The other internal emails similarly occurred around critical moments in Plaintiff's employment dispute: in November 2019, just after his contract expired; and in March 2020, when Plaintiff reached out seeking reemployment. This timeline thus does not suggest any discriminatory motive.[2]

Defendants assert the decision not to re-hire Plaintiff was made based on a series of behavioral complaints and concerns about his quality of care. Plaintiff argues this is pretextual and he points to specific claims Defendants made with respect to the reasons for not renewing his contract and argues there are genuine issues of material fact with respect to each.

First, Defendants justified not renewing Plaintiff's contract by citing numerous patient and staff complaints. Plaintiff argues those complaints were solicited only after the decision not to renew his contract was made, and that they were all anonymous and never addressed with him directly.[3] In an internal email sent after notifying Plaintiff YRMC would not be renewing his contract, YRMC staff noted they were "trying to find out how

---

[2] Plaintiff also argues he experienced "negative comments" related to his military service that indicate Defendants improperly considered his military service when deciding not to renew his contract in conjunction with the timing. (Doc. 35 at 10). Specifically, Plaintiff claims that during the conversation where YRMC told him they would not renew his contract, YRMC staff (specifically, Dr. Nimmagadda and Dr. Gerais, not Dr. Magu) told him they "needed people to work . . . in November [and] December," after the ICA expired but when Mustafa was deployed, so they hired new people to fill those shifts. (Mustafa Depo. at 119-120; 130). He also testified that Dr. Gerais (not Dr. Magu) said, "oh, you are going again?" when Plaintiff submitted paperwork for his deployment in 2019. (Mustafa Depo. at 130). Lastly, Plaintiff testified that in 2017 or 2018, Dr. Gerais (not Dr. Magu) told Plaintiff he was not considered for a leadership position because he was in the military and would be "out of the country, so [he] cannot be here all of the time." (Mustafa Depo. at 130-131). Even if all of these statements are true, Plaintiff does not provide sufficient evidence regarding them for the Court to credit them as indicative of discrimination with respect to the decision not to renew his contract in 2019.

[3] Plaintiff also argues there is no evidence he received more complaints than any other hospitalist at YRMC to justify his dismissal. (Doc. 35 at 11).

- 11 -

many of the complaints/ patient care issues have been addressed with him and if there was a record of that." (Doc. 35-1 at 40). Plaintiff argues that timing suggests YRMC was trying to create a paper trail to justify not renewing his contract.[4] However, Defendants provided records of complaints from patients and staff going back years. (Doc. 31-16 and 31-17).[5] And Plaintiff admitted he was aware of some patient complaints against him. (Mustafa Depo. at 111-116). Rather than "creating a paper trail," YRMC argues it was trying to gather the relevant materials in light of Plaintiff's objections to YRMC not renewing his contract. (*See* Doc. 35-1 at 40). Plaintiff's conclusory and speculative allegations that Defendants were building a paper trail to cover up discrimination is not sufficient to establish an issue of fact regarding pretext. *See Villodas v. HealthSouth Corp.*, 338 F. Supp. 2d 1096, 1104-05 (D. Ariz. 2004) (citing *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1151-52 (9th Cir. 1988)) ("Reliance on mere speculation, conjecture, or fantasy cannot defeat a motion for summary judgment.").

Second, Defendants said, and Plaintiff admitted, that Plaintiff did not reach out to renegotiate his contract at any point before it expired, or when it expired while Plaintiff was deployed in the Middle East. Defendants point to Plaintiff's admission that "[t]hinking back, probably [he] should have" sought to renew the contract. (Mustafa Depo. at 122). Plaintiff argues, however, his experience every other time one of his contracts to work at YRMC expired was that someone would reach out to him to begin the negotiation process. (Mustafa Depo. at 54-55). YRMC acknowledged that "from time to time" it initiated the process. (YRMC Depo. at 162-163). YRMC further responded that for Plaintiff's previous

---

[4] Additionally, in late March 2020, YRMC staff internally discussed re-hiring Plaintiff on a part-time basis to have a backup plan in case full-time hospitalists called in sick. (Doc. 35-1 at 44). Dr. Magu said he was "ok with back up as long as it[] doesn't destabilize hospitalist budget further." (Doc. 35-1 at 44). Plaintiff argues that suggests the reasons for not renewing his contract were pretextual. The record is not fully developed on this point. The fact that YRMC was discussing back up plans in the event of staffing shortages does not indicate YRMC's earlier decision not to rehire Plaintiff was motivated by his military service. In fact, it may support the argument that the original decision not to negotiate a new contract with Plaintiff was based on what he was told at the time.
[5] While Plaintiff argues that because some complaints predated the ICA, it "strains credulity" that those same complaints could support YRMC's decision not to extend a new contract in 2019. (Doc. 35 at 11). However, the reverse is also true: Plaintiff was in the Army at the time he entered the ICA, and he had deployed previously in 2013. (Mustafa Depo. at 130).

contracts, YRMC did not negotiate directly with Plaintiff, but went through various staffing agencies; accordingly, this was the first time Plaintiff and YRMC contracted directly with each other, so there was no established pattern of renewal. (Doc. 38 at 6). Additionally, the ICA did not have established procedures for renewal or impose notice requirements on either party for the end of the term. (*See* ICA at § 4). The fact that YRMC did not affirmatively reach out to Plaintiff before or upon expiration of his contract does not demonstrate discriminatory motive or pretext.

Lastly, Defendants told Plaintiff they no longer needed his services. Plaintiff argues this cannot be true as a matter of established fact, since YRMC went on to hire additional hospitalists to replace him in 2020. (Doc. 35-1 at 56). However, Defendants argue that merely because they did not need Plaintiff's services did not mean they no longer needed hospitalists. Of course, employers cannot evade claims of discrimination by simply stating they did not need a particular person's services. On the record here, though, there is not enough to get to the jury on the question of discriminatory motive or pretext.

Pretext may be shown by a number of means, including when an employer offers multiple or shifting explanations, or explanations that are "so fishy and suspicious" that a jury could find the employer "lacks all credibility." *See Curley v. City of North Las Vegas*, 772 F.3d 629, 633 n.3 (9th Cir. 2014). The Court is sensitive to the fact that "discrimination is seldom open or notorious." *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005) (quoting *Sheehan*, 240 F.3d at 1013); *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006). However, even considering all of the Defendants' explanations and Plaintiff's arguments concerning each, there is insufficient admissible evidence to establish a genuine issue of material fact whether Defendants' proffered reasons were pretextual. Even if Plaintiff had met his burden of showing his military status was a motivating factor, Defendants have sufficiently shown there to be no genuine issue of material fact as to whether Defendants would have declined to renew his contract even in the absence of Plaintiff's military service.

### c. Conclusion

Defendant's motion for summary judgment on this count must be granted.

**II. Arizona Employment Protection Act**

Plaintiff claims Defendants violated Ariz. Rev. Stat. § 23-1501(A)(3)(c)(vii), which prohibits an employer from terminating an employment relationship in retaliation for "service in the national guard or armed forces as protected by sections 26-167 and 26-168." In 2018, the Arizona legislature amended AEPA to specify:

> "When ordered to perform active duty or training by the competent orders of any state or the United States, members of the national guard or United States armed forces reserves shall have the protections afforded to persons under federal active duty by . . . the uniformed services employment and reemployment rights act of 1994 (108 Stat. 3149; 38 United States Code §§ 4301 through 4333)."

A.R.S. § 26-168(D); 2018 Ariz. Legis. Serv. Ch. 118 (H.B. 2421). "The protections of USERRA and AEPA are thus coextensive and the analysis is identical." *Daubenspeck*, 2021 WL 4803560, at *5. Accordingly, for the same reasons explained above, Defendants' motion for summary judgment on the AEPA claim is granted.

**III. Breach of Covenant of Good Faith and Fair Dealing**

Defendants argue they are entitled to summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Plaintiff argues there are genuine issues of material fact with respect to this claim.

In Arizona, every contract "implies a covenant of good faith and fair dealing." *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986). Thus, employment contracts imply a covenant of good faith and fair dealing, but they do not protect employees from a "no-cause" termination. *Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1156 (D. Ariz. 2016). Instead, a "claim for breach of the implied covenant may be viable if a plaintiff is alleging that conduct other than the termination itself breached the covenant." *Id.* (citing *Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d 1264, 1272 (9th Cir. 1990)). The implied covenant of good faith and fair dealing "prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *IOW, LLC v. Breus*, 425 F. Supp. 3d 1175, 1188 (D. Ariz. 2019) (quoting *Wells Fargo Bank v. Ariz. Laborers*, 38 P.3d 12, 29 (Ariz. 2002)). "A party may breach the implied covenant even in the absence of a breach of an express provision of the contract by denying

the other party the reasonably expected benefits of the agreement." *IOW, LLC*, 425 F. Supp. 3d at 1188 (quoting *Nolan v. Starlight Pines Homeowners Ass'n*, 167 P.3d 1277, 1284 (Ariz. Ct. App. 2007)). "To determine the parties' reasonable expectations, 'the relevant inquiry always will focus on the contract itself, to determine what the parties did agree to.'" *Two Brothers Distrib. Inc. v. Valero Marketing and Supply Co.*, 270 F. Supp. 3d 1112, 1128-29 (D. Ariz. 2017) (quoting *Rawlings*, 726 P.2d at 570).

Accordingly, the Court begins with the ICA itself, which governed Plaintiff's arrangement with YRMC. The contract provision setting the term of the agreement states: the term "shall continue through a term mutually agreed upon by YRMC and Physician, but not longer than three (3) years, unless YRMC and Physician mutually agree to amend the terms." (ICA at §4.1). Additionally, the contract allowed for termination by YRMC for cause (ICA at § 4.2), by Plaintiff upon YRMC's breach (ICA at § 4.3), or by either party, without cause, with 30 days' notice (ICA at § 4.4).

Plaintiff alleges Defendants breached the implied covenant of good faith and fair dealing by "the acts and omissions as alleged herein that have injured and continue to injure the right of Plaintiff to receive the benefits of his contractual relationship." (Doc. 1 at 4-5). In his opposition to Defendants' motion for summary judgment, Plaintiff argues that the essential question for a jury is whether Plaintiff had a reasonable expectation of continued work with the hospital. (Doc. 35 at 14).

Defendant argues, on the other hand, that Plaintiff has failed to identify any benefit of his contractual relationship he was allegedly denied. (Doc. 31 at 15). The ICA remained in place and both parties operated under it until Plaintiff deployed; during that deployment, Defendants argue, the contract expired by its own terms. Defendants then opted not to negotiate a new contract with Plaintiff when he returned from deployment, and Defendants maintain they had no obligation to renegotiate a new contract with Plaintiff.

Defendants are correct. "The uncontested facts establish that Plaintiff has received all the expressed benefits" of the ICA. *Picht v. Peoria Unified Sch. Dist. No. 11 of Maricopa Cty.*, 641 F. Supp. 2d 888, 896-97 (D. Ariz. 2009). "[T]he procedures by which the decision to renew the contract were to be made are not express terms of the contract."

*Id.* Rather, the express terms of the ICA were that the agreement would expire, or that Plaintiff and YRMC could mutually agree to amend the terms. (ICA at § 4). Even assuming Plaintiff is correct that the renewal process had always been initiated by YRMC in the past, that does not change the fact that renewal was not owed to him under the ICA itself.[6] The issue is whether YRMC improperly declined to negotiate a new contract because of Plaintiff's protected status as a member of the Army Reserves; that question may raise a valid claim of discrimination under USERRA and AEPA, as discussed above, but does not change the nature of the ICA itself or impose a requirement under the contract to enter renegotiations in good faith. Plaintiff was thus not denied "the reasonably expected benefits of the agreement." *IOW, LLC*, 425 F. Supp. 3d at 1188 (quoting *Nolan*, 167 P.3d at 1284).

Defendant's motion for summary judgment on Count III (breach of the implied covenant of good faith and fair dealing) will be granted.

**IV. Aiding and Abetting**

Plaintiff's fourth cause of action alleges that the individual defendants, Dr. Magu and Dr. Trenschel, aided and abetted because they "had knowledge of the primary tort being committed" and their conduct "contributed to Plaintiff's damages." (Doc. 1 at ¶ 52-53). Defendants argue in their motion for summary judgment that, even taking the Plaintiff's allegations as true, the individual defendants acted in the scope of their employment as executives of YRMC; they therefore were legally synonymous with the company which precludes the claim for aiding and abetting. Plaintiff does not specifically address this argument in his response.

This District has varied with regards to whether an agent acting within the scope of an agency can generally be liable as an individual for a tort committed by the principal. *Compare Morrow v. Boston Mut. Life Ins. Co.*, No. CIV-06-2635-PHX-SMM, 2007 WL 3287585, at *5-6 (D. Ariz. Nov. 5, 2007) ("agents are liable to third parties harmed by the agent's tortious conduct, even when the conduct occurs within the scope of the agency");

---

[6] Even if Plaintiff meant to assert an argument of promissory estoppel, "[t]he prior course of dealing may clarify ambiguous terms, but it does not allow Plaintiff to vault the unambiguous plain text of the provision." *Malnar v. Embry-Riddle Aeronautical Univ. Inc.*, 2022 WL 3923525, at *3 (D. Ariz. Aug. 31, 2022).

*Inman v. Wesco Ins. Co.*, No. CV-12-02518-PHX-GMS, 2013 WL 2635603, at *4 (D. Ariz. June 12, 2013) ("aiding and abetting claim is not barred simply because a person worked for the alleged primary tortfeasor and was acting within the scope of her employment") *with Ortiz v. Zurich Am. Ins. Co.*, No. CV-13-02097-PHX-JAT, 2014 WL 1410433, at *3 (D. Ariz. Apr. 11, 2014) (declining to follow *Morrow* and *Inman* because "[a] single actor cannot substantially assist or encourage her own acts" and holding a viable claim for aiding and abetting requires the individual agents to take "separate action in concert with the action giving rise to Plaintiff's claim against" the principal); *Biliack v. Paul Revere Life Ins. Co.*, No. CV-16-03631-PHX-DJH, 2020 WL 10790248, at *4 (D. Ariz. May 19, 2020) (following *Ortiz* and granting summary judgment for defendants where Plaintiff failed to offer evidence of a separate act by the individual defendants).

On the facts here, the Court follows the reasoning in *Ortiz* and *Biliack*. Like in *Biliack*, here there is "no evidence of a separate tortious act in concert with the primary tortfeasor." *Biliack*, 2020 WL 10790248, at *4. Indeed, Plaintiff's allegations in Count I (USERRA),[7] Count II (AEPA), and Count III (breach of covenant of good faith and fair dealing) all specifically allege conduct by YRMC. (Doc. 1 at ¶¶ 26-46). No specific additional conduct is alleged to have been committed by either individual defendant; rather, Plaintiff reiterates in his complaint that the individual defendants "committed acts of discrimination, retaliation and/or wrongful termination against Plaintiff" (Doc. 1 at ¶ 48)— the very same conduct that undergirds his complaints against YRMC. *Cf. Ortiz*, 2014 WL 1410433, at *5 ("Plaintiff alleges only one tortious act" and "fails to allege any separate action by" individual defendants "in concert with the action giving rise to Plaintiff's" claim against the principal).

---

[7] Plaintiff's complaint alleges Defendants' "acts of discrimination, retaliation, and/or wrongful termination against Plaintiff . . . sound in tort," which the individual defendants aided and abetted. (Doc. 1 at ¶ 47-48). However, it is unclear whether aiding and abetting claims may properly be predicated on alleged violations of USERRA. *See Gross v. City of Jersey City*, No. 18-9802, 2019 WL 2120312, *3 n.6 (D.N.J. May 15, 2019). USERRA creates a cause of action to remedy discrimination based on military service; it may or may not be appropriate to view USERRA as creating or codifying a tort such that the employer sued with violating USERRA would be a traditional "tortfeasor." Regardless, the Court addresses the Defendants' arguments because Plaintiff additionally brought a claim for breach of the covenant of good faith and fair dealing.

Regardless, Plaintiff still has not demonstrated a genuine issue of material fact with respect to the individual defendants' liability for aiding and abetting. As Defendants argue, aiding and abetting liability "is based on proof of a scienter . . . the defendants must *know* that the conduct they are aiding and abetting is a tort." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust*, 38 P.3d 12, 23 (Ariz. 2002) (quoting *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186 (Minn. 1999)). Even drawing all reasonable inferences in favor of Plaintiff, nothing in the record demonstrates such scienter. Plaintiff concedes there is no such evidence with respect to Dr. Trenschel. (Doc. 35 at 15). Plaintiff argues Dr. Magu "is presumed to know" that failing to rehire him after his deployment violated USERRA. (Doc. 35 at 16). However, Plaintiff also admitted that Dr. Magu never said anything to Plaintiff about his contract and was always friendly and fair to him. (Mustafa Depo. at 129). YRMC was apparently only able to produce two emails sent by Dr. Magu. (Doc. 35 at 15).[8] Plaintiff has thus failed to show a genuine issue of material fact with respect to any additional tortious conduct undertaken by the individual defendants or their scienter of the alleged primary tort.

Accordingly, Defendant's motion for summary judgment on Count IV (aiding and abetting) will be granted as to all defendants.

**V. Tortious Interference**

Lastly, Defendants move for summary judgment on Plaintiff's fifth count, which alleges tortious interference with business expectancies—namely, a continued contractual relationship with YRMC. (Doc. 1 at ¶ 57; Doc. 31 at 16-17). Plaintiff concedes there is insufficient evidence to justify liability for Dr. Trenschel. (Doc. 35 at 15). Plaintiff argues Dr. Magu, though, was "directly involved in harming Plaintiff's business expectancy on the grounds of Plaintiff's military service and deployment." (Doc. 35 at 15). Defendants argue Dr. Magu was acting on behalf of YRMC at all relevant times, so cannot be liable for tortious interference with the contract YRMC was a party to. (Doc. 31 at 16). Plaintiff

---

[8] One email from Dr. Magu sent in February 2019 contains language indicating Plaintiff "is being slowly phased out of the schedule." (Doc. 35-1 at 29). Dr. Magu sent this in response to a question asking if he was "aware of the many issues with Dr. Mustafa?" (Doc. 35-1 at 29).

- 18 -

does not address that argument. (*See* Doc. 38 at 10).

Defendants are correct. A claim of tortious interference "necessarily requires the existence of an expectancy between plaintiff and a third party, with which defendant interferes." *Morrow*, 2007 WL 3287585, at *11; *Mintz v. Bell Atlantic Systs. Leasing Int'l, Inc.*, 905 P.2d 559, 564-65 (Ariz. Ct. App. 1995) (quoting *Wagenseller v. Scottsdale Mem. Hosp.*, 710 P.2d 1025, 1042 (Ariz. 1985)) (claim only available "when a third party improperly and intentionally interferes with the performance" of a contract or with business expectancies). However, "[t]here is no 'third party' in this case." *Mintz*, 905 P.2d at 564. The individual defendants "did not interfere with an expectancy between Plaintiff and a third party because the [individual] Defendants operated as agents" for YRMC, the contracting party. *Morrow*, 2007 WL 3287585, at *11. Even if a claim against Dr. Magu could be sustained individually, Plaintiff has not provided sufficient admissible evidence to survive summary judgment on a tortious interference claim. Plaintiff relies on the same evidence as discussed above—namely, a single email where Dr. Magu notes Plaintiff "is being slowly phased out of the schedule" (Doc. 35 at 15; Doc. 35-1 at 29)—which, even taken in the light most favorable to Plaintiff, does not create a genuine issue of material fact for trial with respect to Dr. Magu's separate tortious involvement.

Defendant's motion for summary judgment on Count V will be granted as to all defendants.

Accordingly,

**IT IS ORDERED** Plaintiff's motion for partial summary judgment (Doc. 30) is **DENIED**.

**IT IS FURTHER ORDERED** Defendant's motion for summary judgment (Doc. 31) is **GRANTED**. The Clerk of Court shall enter judgment in favor of Defendant.

Dated this 11th day of January, 2023.

Honorable Roslyn O. Silver
Senior United States District Judge